# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUPE RAMIREZ, | ) 1:09cv01508 DLB |
| | ) |
| | ) |
| Plaintiff, | ) ORDER REGARDING PLAINTIFF'S |
| | ) SOCIAL SECURITY COMPLAINT |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## BACKGROUND

Plaintiff Lupe Ramirez ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.

## FACTS AND PRIOR PROCEEDINGS[1]

Plaintiff filed her application for DIB on December 27, 2005. AR 136-40. She alleged disability since March 31, 2005, due to migraines, depression, and neck and back spasms. AR 136-38, 181. After her application was denied initially and on reconsideration, Plaintiff

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

1  requested a hearing before an Administrative Law Judge ("ALJ").   AR 74, 82, 91-94, 98-101,

2  104.  ALJ Bert C. Hoffman, Jr., held a hearing on July 8, 2008, and denied benefits on December

3  1, 2008.  AR 6-17, 18-73.  The Appeals Council denied review on June 26, 2009.  AR 1-4.

4        Hearing Testimony

5        ALJ Hoffman held a hearing on July 8, 2008, in Fresno, California.  Plaintiff appeared

6  with her attorney, Melissa Proudian.  AR 9, 20.

7        Plaintiff was 50 years old at the time of the hearing.  She is 5'2" and weighs 140 pounds.

8  She is right handed.  AR 21.  She is not married.  She has two children, ages 24 and 25.  Her 25-

9  year-old daughter and 9-year-old grandson live with her.  She has a driver's license and drives

10  about five miles daily.  She has limited her driving because of her pain and her health.  AR 22-

11  23.

12        Plaintiff completed the twelfth grade.  She never pursued any college units or vocational

13  training.  She last worked in 2005 as a receptionist for a box manufacturing company.  She

14  worked there 15 years.  She had a lot of duties, including filing, copying, answering the phone,

15  typing, computer work, meeting the public, mailing and receiving packages and logging in time

16  cards.  The heaviest amount of weight that she had to lift was ten pounds.  AR 24-25.

17        Plaintiff testified that she was terminated from her job due to injury.  Her injury was pain

18  in her neck, back and hands, along with stress.  She had a Workers' Compensation case, which

19  settled.  In terms of settlement, she received $65,000 based on all of her impairments, but did not

20  receive future medical treatment.  She has not worked since that time and has not been able to

21  find other work due to her medical issues.  She does not feel that she could work at any job eight

22  hours a day, five days a week.  She was found permanent and stationary, but did not remember

23  the limitations placed on her.  She saw two agreed medical examiners.  AR 26-29.

24        Plaintiff testified about the problems that prevent her from working.  She has a lot of pain

25  and tingling in her hands.  She has pain in her neck and back.  She also has stress, anxiety and

26  headaches.  AR 30-31.

27        She has pain in both of her hands every day.  It comes and goes.  Sometimes she feels

28  pain, tingling and her hands go numb.  She can use both hands together on a repetitive basis.  She

1  can use her hands repetitively about 15 minutes before she has to stop for 15 to 30 minutes.  AR

2  31-33.

3       Plaintiff has wrist braces.  She wears them all the time at night.  During the day, she

4  wears them about two to three hours.  She will wear them three to four days out of the week for

5  four to six hours.  She does not have them on all the time.  AR 33-34.

6       She has carpal tunnel in her hands.  It is getting worse.  Dr. Brubaker, her doctor,

7  mentioned surgery about two years earlier.  She has been seeing him for about three years.  He

8  did not give her any injections or physical therapy for her hands.  The surgery was for her right

9  hand.  She feels more pain in that hand because she uses it more.  She can lift five pounds with

10 her right hand and five pounds with her left hand for no more than five minutes.  After the five

11 minutes, she would have to take a fifteen minute break for her right hand.  She probably could

12 turn around and just pick up another five pounds with her left hand and hold it for five minutes.

13 She could keep doing that repeatedly with her left hand for about 15 minutes.  After that, she

14 would have to take a break for 15 minutes to a half hour before she could go back to lifting five

15 pounds.  AR 34-38.

16       To relieve the pain in her hands, Plaintiff will rest them or wear her brace.  She takes

17 Vicodin and Ibuprofen for pain.  The Ibuprofen is 800 milligrams.  She has been on Vicodin for

18 about three years.  She will take Ibuprofen every four hours.  She takes Vicodin at least once a

19 day, every day.  The time she takes it varies.  AR 38-40.

20       She has side effects from the Vicodin.  Her stomach gets irritated a couple times a week.

21 About an hour after she takes the Vicodin, she starts getting really tired and it makes her

22 nauseous.  She has to lie down and rest.  She will sometimes sleep for three to four hours.  AR

23 40-41.

24       In terms of her hands, Plaintiff can pick up a coin off a table, but it is difficult.  She

25 cannot grasp because of pain.  She can put a key in a lock and turn it.  She can turn a door knob,

26 but it is difficult.  She can hold a hairbrush and comb her hair.  She sometimes has difficulty

27 grasping the brush.  She feels tingling every day in her right and left hands.  She experiences

28 more pain than tingling.  AR 42-44.

3

1   She can reach overhead or at shoulder height with her right arm with difficulty.  She

2   cannot reach overhead repetitively.  She cannot reach out at shoulder height with the right arm

3   repetitively.  She can reach overhead or at shoulder height with her left arm with difficulty.  She

4   feels pain in her neck and shoulders when she does any type of reaching.  AR 44-46.

5   It is difficult for Plaintiff to hold a pen or pencil to write a message or a letter.  She can

6   write about 15, 20 minutes and then she has to rest her hands about 20, 25 minutes.  She does not

7   use a computer at home.  She could computer key about a half hour and then she would have to

8   rest her hands about 20 minutes.  AR 46-48.

9   Plaintiff has neck pain throughout the day that comes and goes.  Movement triggers the

10   pain.  She can move her head side to side, but has difficulty at times because of stiffness.  She

11   can move her head front to back without difficulty.  Her neck pain radiates into her back.  She

12   takes Vicodin and Ibuprofen to treat the pain.  She also takes Flexeril two to three times a day,

13   every four hours.  She sometimes feels nauseated from the Flexeril.  The Flexeril, in combination

14   with Vicodin and Ibuprofen, takes the neck pain away completely.  She has not had any

15   injections for the pain.  She had physical therapy for her neck in 2005 or 2006.  They stopped her

16   therapy, so she never had a chance to improve.  Dr. Brubaker treats her for neck pain.  Her

17   attorney sent her to a specialist, Dr. Kucera.  AR 48-52.

18   Plaintiff has pain in her upper back on a daily basis.  It sometimes lasts eight hours.  The

19   pain affects her ability to function.  She cannot do anything.  She either lies down or sits down.

20   She takes the Vicodin, Ibuprofen and Flexeril to treat the pain.  She has not had physical therapy

21   or injections for the pain.  They have not talked about any surgery.  The pain does not radiate into

22   any other party of her body, just her neck and upper back.  She feels the pain throughout her neck

23   and whole back.  AR 53-55.

24   Plaintiff can sit in a chair for a half hour.  She can stand about 30 minutes before she has

25   to rest and sit.  She will sit for 20 minutes and then get back up.  She can walk about 3 minutes

26   before she has to stop.  She can walk a half hour and then she has to rest.  She sometimes feels

27   weakness and loses her balance when walking.  A few times, she dropped to her knees.  It

28   happens maybe once every two months.  If she drops something, she can bend down and pick it

4

1    up with no difficulty.  She can squat, but has a hard time getting back up.  She can kneel without

2    difficulty.  AR 55-57.

3           Plaintiff testified that she has a lot of difficulty focusing or concentrating.  The longest

4    she can focus is under an hour.  At that point, she just stops and takes a break.  She would have

5    to take a break for two to three hours before she could return to concentrating.  AR 57-58.

6           The medication that Dr. Brubaker has given her for stress has helped.  From time to time

7    she will go into a deep depression.  She can go into a depression two times a week.  Sometimes it

8    will last all day.  When she is depressed, she cannot complete tasks.

9           Plaintiff underwent an eight-week counseling session in 2006 for her depression.  She

10   told Dr. Brubaker that she is still experiencing depression.  They changed her medication.  She

11   has not asked him to recommend counseling or therapy.  The newer medications help and make

12   the depression less frequent.  She no longer experiences the depression once or twice a week.  It

13   is maybe twice a month.  On the days she has depression, it sometimes lasts throughout the day.

14   She has been depressed once or twice a month for the last six months.  AR 58-62.

15          Plaintiff sometimes has headaches daily and sometimes every other day.  A few months

16   earlier, she had a headache for about seven days and went to Community Hospital.  They injected

17   her with some pain medication that helped.  Sometimes her headaches will last for an hour or

18   two.  She will treat them with Ibuprofen or over-the-counter medication.  It takes the headache

19   away completely.  She does not have side effects from the over-the-counter medication.  AR 63-

20   64.

21          Plaintiff cooks about three days a week.  She sometimes watches her grandson.  She does

22   not do much outside of the home.  She will go for a walk, but cannot do a lot of walking.  AR 65-

23   66. Her best girlfriend will get her out of the house and take her to town.  They visit each other.

24   They will go have dinner or lunch at a restaurant, but that doesn't happen often.  AR 67.  She

25   goes back to Mendota once a year.  She has a brother in Kerman that she visits from time to time.

26   She will go for walks with her grandson.  They will watch a movie at home.  She will walk to his

27   football games and stay as long as she can.  She does not have any kind of church life.  AR 68-

28   69.

1    In terms of cleaning, she will pick up and dust when she can.  She will vacuum about ten
2    minutes.  She can't do windows.  She will do some grocery shopping twice a week.  AR 70.

3    <u>Medical Record</u>

4    Plaintiff received treatment from Daniel B. Brubaker, D.O., between January 2005 and
5    January 2008.  AR 369-466, 528-64.

6    On January 16, 2005, Dr. Brubaker reviewed a MRI, which showed an annular disc tear at
7    C5 and 6, along with facet arthropathy.  Plaintiff reportedly was very anxious about her condition
8    and had significant financial problems.  Dr. Brubaker opined that she was not malingering or
9    "faking it."  She had a "definite objective finding" that would probably require surgery at some
10   later date.  He planned to get her onto antidepressants, sleep medication, anti-inflammatories,
11   pain medication, analgesics and muscle relaxants.  He also planned to continue with medication
12   for high blood pressure, Relpax for migraines and Valium for severe muscle contraction
13   headaches.  AR 464-66.

14   On February 15, 2005, Karen Hansen-Smith, M.D., prepared a note to excuse Plaintiff
15   from work because of severe muscle spasm in her neck.  Dr. Hansen-Smith also wrote a
16   prescription for a telephone headset to reduce strain on Plaintiff's neck and shoulders.  AR 265.

17   On March 1, 2005, Diego Allende, D.O., prepared a Doctor's First Report of
18   Occupational Injury/Illness.  Plaintiff stated that she was employed as a receptionist for a
19   company that had been acquired by a new owner approximately one year ago.  She felt her job
20   was in jeopardy due to comments from her personnel manager, which indicated that upper
21   management was trying to get rid of her because they were unhappy with her work performance.
22   Plaintiff complained of severe neck and shoulder pain with severe headache while sitting or
23   moving head from side to side.  She felt the injury was stress related.  AR 260.

24   On examination, Plaintiff had a spasmatic bilateral trapezius from her neck to her
25   shoulders.  She had decreased range of motion with left and right rotation at approximately 70
26   percent.  She also exhibited antalgic posturing.  She was very sensitive to touch with palpation of
27   her neck and shoulder area.  AR 261.  Dr. Allende did not believe that her symptoms were due to
28   work stress, but rather neck strain.  He diagnosed her with bilateral trapezius strain and

6

1    situational stress.  He recommended that the stress portion of her claim be placed on delay.

2    However, he recommended treatment for her trapezius strain and ordered Prioxicam, Vicodin,

3    Zantac and Flexeril.  He also ordered rehabilitation therapy for twelve visits to increase mobility

4    and decrease spasm and pain.  He recommended that Plaintiff continue the use of a headset while

5    doing receptionist phone duties.  He concluded that she was able to perform her usual and

6    customary work with the restriction of use of her headset at all times.  AR 262.

7         On March 8, 2005, Dr. Allende examined Plaintiff and prepared a Primary Treating

8    Physician's Progress Report ("Progress Report").  He diagnosed Plaintiff with bilateral trapezius

9    muscle strain and stress claim.  He refilled her Vicodin and prescribed Flexeril.  He

10   recommended therapy for her shoulder.  AR 258.

11        On March 15, 2005, Dr. Allende prepared another Progress Report.  He noted that

12   Plaintiff reported a "stress claim" because her new employer had caused undue stress.  Plaintiff

13   told Dr. Allende that "the employer instituted a program in which they were doing away with her

14   position . . . [and] would not need the services of a receptionist."  She was concerned about

15   losing her job.  She had no specific injury to her neck or upper back.  On examination, Plaintiff

16   was somewhat stressed and a little anxious.  She had increased muscular tone in the cervical and

17   thoracic regions.  She had a "little bit" of inhibition in movement of the vertebral bodies.  She

18   had minimal point tenderness and some restricted range of motion.  Her neurologic examination

19   was normal.  AR 252-53.

20        Dr. Allende diagnosed bilateral trapezius muscular strains.  It seemed "quite clear" that

21   this "appears to be the [Plaintiff's] attempt at retaining her job."  It did not appear as if any

22   particular injury existed, except for the increased muscle tone and spasm in her neck and back

23   area.  It was "not necessarily related to a stress condition that occurs from being mistreated in the

24   work environment or from an undue amount of stress by an employer."  AR 253.  Dr. Allende

25   indicated that, based on Plaintiff's own admission, she was "basically filing the claim to hold on

26   to her job."  She was demanding to see a psychiatrist and demanding therapy.  Dr. Allende felt it

27   was appropriate to continue some range of motion therapeutic treatments for her neck and back

28   on a minimal basis.  He felt that a psychiatrist was not appropriate.  Plaintiff requested some

7

ibuprofen and Dr. Allende gave her 60 tablets.  He reported that the previous week she received

prescriptions for Vicodin and Flexeril.  Although she asked for them again, it was revealed that

she had taken over the prescribed amount of Flexeril and Vicodin.  Dr. Allende informed her of

the misuse and refused to refill the medications until the end of the week.  AR 253.  He opined

that Plaintiff could return to work without restrictions on March 15, 2005.  AR 511.

On March 17, 2005, Plaintiff's workers' compensation claim was denied.  AR 506.

On April 12, 2005, Dr. Hansen-Smith indicated that Plaintiff's medical problem started

on February 14, 2005, and she was released to return to her regular/customary work on February

25, 2005.  AR 264.

On April 19, 2005, Dr. Brubaker prepared an initial report.  Plaintiff complained of

stiffness in the neck and shoulder, numbness in her arm, tingling in her back, weakness in her

arm and hand and grinding of the shoulder joint.  She last worked on March 31, 2005.  She

reported being fired from her job as the position was eliminated.  Following examination, Dr.

Brubaker diagnosed chronic cervical strain, myofascial pain disorder, anxiety, depression and

migraines.  Her referred Plaintiff to Dr. Houghton for psychological evaluation and prescribed

Flexeril, Ibuprofen and Vicodin.  AR 441-46.

On June 2, 2005, Gilbert J. Kucera, M.D., completed an Agreed Medical Examination.

Plaintiff reported that after being released to work with a headset, her case was denied by the

Workers' Compensation insurance carrier.  An x-ray of the cervical spine dated June 2, 2005,

showed loss of lordosis due to worsening of muscle tightness, moderate degenerative change at

5-6, with narrowing and anterior spurring moderate.  Shoulder x-rays were normal.  Dr. Kucera

opined that Plaintiff's condition was not permanent and stationary.  She was in need of additional

treatment for at least six months.  Dr. Kucera diagnosed injury, industrial, cumulative trauma

related to work activities as a full-time receptionist requiring repetitive movements of the

cervical spine, upper back and bilateral upper extremities, resulting in sprain/strain, tendinitis,

neuritis, chronic strain, and overuse syndrome with residual symptoms.  He indicated an element

of stress was involved, which could magnify subjective complaints and objective findings.  He

recommended periodic medical observation, medication, a MRI of the cervical spine, an EMG of

the upper extremities, and consideration of injections in the neck, upper back and bilateral upper extremities. He saw no need for surgical treatment. AR 356-68.

A MRI of the cervical spine completed on August 26, 2005, revealed a posterior disk bulge with associated hypertrophy of the adjacent bony margins at C5-6 impressing upon the cord. There were no disk herniations or significant stenosis at any other levels. She had lesser disk bulges of other interspaces. AR 266-67.

On September 14, 2005, Dr. Kucera prepared a supplemental report following review of additional medical records. Based on his review, Plaintiff had a pre-existing level of disability in her right shoulder from a 1997 motor vehicle accident of a level of at least intermittent slight, which should be subtracted from her present disability in her right shoulder. Dr. Kucera saw no reason to change any other aspect of his previous opinion. AR 602-05.

In October 2005, Dr. Brubaker opined that Plaintiff could not sit for more than 30 minutes and asked the she be excused from jury duty. AR 411.

On November 14, 2005, Dr. Brubaker opined that Plaintiff's job situation and financial problems were causing situational psychological problems. AR 409.

On November 28, 2005, Norman Reichwald, Psy.D., a licensed psychologist, completed an initial psychological pain evaluation. He indicated that Plaintiff was placed on disability beginning on March 31, 2005, and continued through November 15, 2005. On mental status evaluation, Dr. Reichwald noted mild physical discomfort. Her affect was subdued and she exhibited a depressed feeling or tone. She denied auditory or visual hallucinations and showed no evidence of delusion, bizarre or magical thinking. She had average judgment and insight. Following a psychological assessment, Dr. Reichwald diagnosed Plaintiff with adjustment disorder due to chronic pain mixed with anxiety and depressed mood and a Global Assessment of Functioning ("GAF") of 52. He opined that she had been significantly impacted by intense pain, limiting her abilities and performance of daily tasks. She also had difficulty concentrating. However, she demonstrated no psychological pathology or symptomology that reached the level of a psychiatric disorder. Her psychological symptoms were mild to moderate and a response to her physical pain. They were considered a normal response and adjustment. He recommended

1   weekly biofeedback therapy for eight sessions to learn coping mechanisms.  He also

2   recommended evaluation by a psychiatrist.  AR 312-26.

3       In December 2005, Plaintiff reported that her medications had taken her pain from a 10 to

4   a 7/10.  She was still not controlled with her pain.  Dr. Brubaker opined that she was temporary

5   totally disabled.  AR 404.

6       On December 12, 2005, Plaintiff was seen in the emergency room for abdominal

7   cramping associated with rectal bleeding and diarrhea with multiple episodes of bloody and loose

8   stools.  Plaintiff also complained of 8/10 low back pain and abdominal pain.  She was diagnosed

9   with hematochezia and invasive enteritis.  She received a liter of saline and was given Benadryl

10  and Tylenol for pain.  She was also given Levaquin and Lomotil, with a referral to a

11  gastroenterologist.  AR 268-69.

12      Between December 15, 2005, and January 31, 2006, Plaintiff underwent biofeedback

13  therapy sessions.  AR 294-98, 301-308, 327-28.

14      On January 16, 2006, Plaintiff reported that she was better while taking medication.  Her

15  head, neck and back were better, but the tingling and numbness in her arms, hands and toes was

16  worse.  She was having more pain.  Dr. Brubaker diagnosed her with depression and anxiety.  He

17  increased her Xanax, Prozac and Restoril.  AR 396-97.

18      An electromyography ("EMG") study of Plaintiff's upper extremities on January 18,

19  2006, was normal with no evidence of radiculopathy.  A nerve conduction study revealed

20  electrographic evidence of bilateral carpal tunnel syndrome, which was moderate in nature with

21  the right being greater than the left.  There also was a suggestion of cubital tunnel syndrome

22  bilaterally.  It was recommended that Plaintiff be referred to a hand surgeon and conservative

23  treatment be attempted with splinting and physical therapy.  AR 274-78.

24      On January 20, 2006, Dr. Kucera prepared a supplemental report following review of

25  Plaintiff's deposition transcript.  The deposition did not change his previous opinion.  AR 596-

26  99.

27

28

On February 22, 2006, Deborah Digiaro, Ph.D., a licensed psychologist, completed a final treatment summary. Dr. Digiaro indicated that Plaintiff had completed a regimen of prescribed treatment and had developed adequate coping skills. She was discharged from psychological treatment. She was prescribed Xanax for anxiety, Prozac for depression and Restoril as a sleep aid. Dr. Digiaro's final diagnosis was adjustment disorder with a Global Assessment of Functioning ("GAF") of 58. AR 281-85. Treatment notes from the same date reflect a GAF of 65. Dr. Digiaro recommended future biofeedback and psychotropic medication monitoring. AR 287-88.

On March 1, 2006, Eric S. Morgenthaler, Ph.D., a licensed psychologist, completed a psychological testing report. The test data showed that Plaintiff was "a somatically preoccupied, depressed and anxious individual." She was "prone to convert and displace feelings of emotional distress into somatic representations." Dr. Larsen opined that there was "a high probability" that a significant psychological component underlay many of her physical complaints. The data indicated that her personality was best characterized by "an admixture of histrionic and dependent dynamics that could predispose her to repression, emotional lability, the somatic expression of emotional distress, helpless dependency, interpersonal hypersensitivity and impressionistic reasoning." The data suggested that somatoform, depressive and anxiety disorders be considered. Signs of histrionic and dependent personality dynamics and a personality disorder also should be considered relative to her history and culture. AR 566-70.

On March 2, 2006, Robert Larsen, M.D., M.P.H. completed a psychiatric disability agreed medical examination report. Plaintiff reported anxiety attacks approximately three times per week. Following an interview and review of records, Dr. Larsen determined that Plaintiff struggled with various parameters of her work that led to her developing both physical and emotional problems. She experienced a "reactive depression," with features of sadness, self-doubt, reduced hopefulness, anxious worry and psychophysiologic complaints. Her standardized testing pointed toward histrionic and dependent traits. Dr. Larsen diagnosed depressive disorder not otherwise specified with associated anxiety and psychophysiologic complaints. He assigned a GAF of 60. He also opined that she exhibited features of a clinical depression with associated

1    elements of anxiety and stress-related complaints.  The predominant cause emanated from her

2    work as a receptionist.  Dr. Larsen deemed her credible, finding no indication that she was

3    exaggerating her complaints.  He agreed with Dr. Kucera's opinion that Plaintiff was temporarily

4    totally disabled.  Her psychiatric symptoms were in the moderate range of severity.  AR 483-501.

5        On March 2, 2006, Plaintiff reported that her lower back was in constant pain and her

6    legs felt weak.  AR 388.

7        On March 14, 2006, Dr. Kucera reviewed additional records.  He saw no new or different

8    information to change his previous opinion.  AR 574-76.

9        On March 24, 2006, E. E. Wong, a state agency physician, completed a Residual

10   Functional Capacity Assessment form.  Dr. Wong opined that Plaintiff could lift and/or carry 20

11   pounds occasionally, 10 pounds frequently, could stand and/or walk about 6 hours in an eight-

12   hour workday, could sit about 6 hours in an eight-hour workday and could push and/or pull

13   without limitations.  She frequently could climb ramps and stairs, balance, stoop, kneel, crouch

14   and crawl.  She occasionally could climb ladders, ropes and scaffolds.  She was limited to

15   occasional overhead work due to neck strain and occasional seizing, grasping and torquing with

16   her right upper extremity due to positive Tinel's.  She frequently could perform light handling

17   with her right upper extremity.  She had no visual or communicative limitations, but should

18   avoid concentrated exposure to hazards.  AR 329-36.

19       On March 30, 2006, Plaintiff reported to Dr. Brubaker that she felt much better and that

20   Zoloft was helping her.  She had Tinel's and Reverse Phalen's bilaterally.  He diagnosed her with

21   bilateral carpal tunnel syndrome.  AR 386.

22       On April 28, 2006, F.A. Breslin, Ph.D., a state agency psychologist, completed a

23   Psychiatric Review Technique form.  He opined that Plaintiff had an adjustment disorder with

24   anxiety and depression that did not precisely satisfy the diagnostic criteria of an affective

25   disorder.  She also had an anxiety disorder with panic attacks that did not precisely satisfy the

26   diagnostic criteria of an anxiety-related disorder.  She had mild restriction of her activities of

27   daily living, moderate difficulties in maintaining social functioning, moderate difficulties in

28   maintaining concentration, persistence or pace and no episodes of decompensation.  AR 339-52.

12

1    Dr. Breslin also completed a Mental Residual Functional Capacity Assessment form.  He

2    opined that Plaintiff was moderately limited in the ability to understand and remember detailed

3    instructions, in the ability to carry out detailed instructions, and in the ability to maintain

4    attention and concentration for extended periods.  She also was moderately limited in the ability

5    to complete a normal workday and workweek without interruptions from psychologically based

6    symptoms and to perform at a consistent pace without an unreasonable number and length of rest

7    periods.  She was moderately limited in the ability to interact appropriately with the general

8    public, the ability to accept instructions and respond appropriately to criticism from supervisors

9    and in the ability to respond appropriately to changes in the work setting.  Dr. Breslin concluded

10   that she could consistently understand, remember and follow simple 1-2 step instructions and

11   usually detailed ones.  She could attend to tasks for 2 hours and maintenance of an acceptable

12   work schedule was not precluded by her psychiatric condition.  He further opined that she should

13   have no intensive interaction with a demanding public.  She could accept direct and non-

14   confrontational correction and could adapt to gradually introduced change.  AR 353-55.

15   On May 10, 2006, Dr. Brubaker opined that Plaintiff's work status was temporary totally

16   disabled.  AR 379.

17   On June 26, 2006, Dr. Brubaker reported that Plaintiff's case had settled.  She continued

18   to complain of head, neck and back pain.  She also had some mild depression.  AR 374.

19   On February 8, 2007, Greg Hirokawa, Ph.D., completed a comprehensive psychiatric

20   evaluation.  Plaintiff reportedly drove to the evaluation.  She complained of feeling depressed

21   and anxious, with poor sleep, increased irritability, decreased comprehension, memory problems,

22   poor concentration, loss of interest and stress.  On mental status examination, her mood appeared

23   depressed.  Her intellectual functioning appeared to be within the average range and her recent

24   and remote memory appeared intact.  She was able to perform a simple three-step command, but

25   was unable to spell the word "world" backwards.  With regard to her daily activities, Plaintiff

26   reported cooking and laundry.  She claimed to need medication reminders from others.

27   Dr. Hirokawa diagnosed a depressive disorder not otherwise specified and panic attacks

28   without agoraphobia.  She had a GAF of 61.  He opined that her symptoms of depression and

anxiety were within the mild range.  Her communication skills were good.  She was capable of managing her funds.  Her ability to remember location and work-like procedures was mildly to moderately limited.  Her ability to understand, remember and carry out very short and simple instructions was mildly limited.  Her ability to understand and remember detailed instructions was mildly limited.  Her ability to maintain attention and concentration for extended periods was mildly to moderately limited.  Her ability to accept instructions from a supervisor and respond appropriately to criticism was mildly limited.  Her ability to perform activities within a schedule, maintain regular attendance, and be punctual was mildly limited.  Her ability to sustain an ordinary routine without special supervision was mildly limited.  Her ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace was mildly to moderately limited.  Her ability to interact with coworkers and to deal with the various changes in the work setting were mildly limited.  The likelihood that she would emotionally deteriorate in a work environment was minimal to moderate.  AR 467-72.

On February 12, 2007, Dr. Brubaker opined that Plaintiff could not function with meds and she was permanent and stationary.  AR 534.

On February 28, 2007, Adi Klein, M.D., completed a consultative internal medicine evaluation.  Following examination, Dr. Klein diagnosed Plaintiff with carpal tunnel syndrome by history, no sign on exam, neck pain, muscular in origin, and anxiety, defer to appropriate specialty.  Dr. Klein opined that Plaintiff could lift and carry 100 pounds occasionally and 50 pounds frequently.  She could stand and walk for 6 hours and sit for 6 hours.  She had no postural, manipulative, visual, communicative or environmental limitations.  AR 473-77.

On July 17, 2007, Plaintiff saw Dr. Brubaker, who noted that Plaintiff had been seen by him until her worker's compensation case settled.  She reported that her carpal tunnel symptoms were worsening.  She was tired, felt helpless and was crying.  On examination, she had positive Tinel's and reverse Phalen's signs.  She also had decreased sensory in her fingers.  Dr. Brubaker diagnosed depression and carpal tunnel syndrome.  AR 532.

1    On January 30, 2008, Dr. Brubaker opined that Plaintiff was doing much better with her

2    medications, but she had numbness in both hands and her carpal tunnel symptoms were

3    worsening.  AR 529.

4        ALJ's Findings

5        The ALJ found that Plaintiff met the insured status requirement through December 31,

6    2009.  She had not engaged in substantial gainful activity since March 31, 2005, her alleged

7    onset date.  The ALJ determined that Plaintiff had the severe impairments of cervical spine

8    strain, positive Tinel's right hand, migraines and adjustment disorder.  AR 11.  Despite these

9    impairments, Plaintiff retained the residual functional capacity ("RFC") to lift and carry 20

10   pounds occasionally and 10 pounds frequently.  She could sit, stand and walk for six hours out of

11   an 8-hour day with limited public contact.  She could occasionally work overhead, seize, grasp,

12   torque with the right upper extremity and frequently handle with the right upper extremity.  AR

13   13.  She could not perform her past relevant work.  However, based on the Medical Vocational

14   Guidelines ("Grids"), she could perform a significant number of jobs in the national economy.

15   AR 16.

16                              **SCOPE OF REVIEW**

17       Congress has provided a limited scope of judicial review of the Commissioner's decision

18   to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

19   the Court must determine whether the decision of the Commissioner is supported by substantial

20   evidence.  42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla,"

21   *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

22   *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

23   reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

24   401.  The record as a whole must be considered, weighing both the evidence that supports and

25   the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

26   995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

27   apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

28   This Court must uphold the Commissioner's determination that the claimant is not disabled if the

Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## **REVIEW**

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that she has a physical or mental impairment of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process.  20 C.F.R. §§ 404.1520 (a)-(g).  Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of her disability; (2) has an impairment or a combination of impairments that is considered "severe" (cervical spine strain, positive Tinel's right hand, migraines and adjustment disorder) based on the requirements in the Regulations (20 C.F.R. §404.1520(c)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) cannot perform her past relevant work; but (5) retains the RFC to perform a significant number of jobs.  AR 11-17.

Here, Plaintiff argues that the ALJ erred (1) in not using a Vocational Expert; (2) in not properly evaluating her mental impairment; and (3) in not translating the Worker's Compensation terminology used by Dr. Larsen.

**DISCUSSION**

A.    Use of Vocational Expert

    1.    Limited Public Contact

Plaintiff contends that she suffers from significant non-exertional limitations that preclude application of the Grids.  She asserts that the ALJ's finding that she was limited to jobs with limited public contact required the use of a VE.

In general, where a claimant suffers only from exertional limitations, the ALJ may apply the Grids at step five to match the claimant with the appropriate work.  *Reddick v. Chater*, 157 F.3d 715, 729 (9th Cir. 1998).  The ALJ may apply the Grids in lieu of taking VE testimony only when the Grids accurately and completely describe the claimant's abilities and limitations.  *Id.* (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).  If a claimant's non-exertional limitations "significantly limit the range of work" she can perform, mechanical application of the grids is inappropriate and a vocational expert would be needed to describe what, if any, jobs existed in the national economy that the claimant could perform.  *Desrosiers v. Sec'y of Housing and Health Servs.*, 846 F.2d 573, 577 (9th Cir. 1988).  The determination of whether a non-exertional limitation significantly limits the range of work the claimant is able to perform is left to the ALJ.  *Id.*

   Contrary to Plaintiff's contention that the existence of a non-exertional limitation makes VE testimony mandatory, a VE is only required where the non-exertional limitation "significantly limits" the range of work available.  In other words, a VE would only be required here if the ALJ determined that a limitation to limited public contact significantly limits the range of work Plaintiff could perform.

Here, the ALJ found that Plaintiff could perform jobs with limited public contact.  AR 13. He also determined that she could perform the full range of light work and her additional limitations had "little or no effect on the occupational base of unskilled light work."  AR 17.  The ALJ therefore relied on the Grids to find Plaintiff not disabled.  AR 17.  It was within the ALJ's province to make this determination.  *Desrosiers*, 846 F.2d at 577.  Such a conclusion is certainly logical given that unskilled work ordinarily involves dealing primarily with objects, rather than

people.  Social Security Ruling ("SSR") 85-15; _Wilson v. Comm'r of Social Sec._, 2010 WL
1267782, *22-23 (E.D.Cal. Mar. 31, 2010) (ALJ properly utilized Grids at step 5 to determine
claimant could perform unskilled work where claimant's non-exertional limitations included
limited public contact).

     2.     Manipulative Limitations

     In a similar argument, Plaintiff contends that the ALJ should have used a VE to determine
the impact of her limitations to occasional overhead work and to occasional grasping, seizing and
torquing with the right upper extremity.  To support this argument, Plaintiff asserts that a
limitation to occasional grasping means she can only occasionally handle.  Opening Brief, p. 7.
Plaintiff points to SSR 85-15, which indicates that reaching and handling are activities required
in almost all jobs.  Relying on the premise that she is limited to occasional grasping, Plaintiff
concludes that the ALJ's use of the Grids was inappropriate and a VE was required to address the
impact on the occupational base.  Plaintiff's argument equating grasping with handling appears
to overlook the ALJ's express finding that she could frequently handle with her upper right
extremity.  AR 13.  Applying Plaintiff's logic, the ability to frequently handle would not impact
the occupational base.  SSR 85-15 ("Reaching (extending the hands and arms in any direction)
and handling (seizing, holding, grasping, turning or otherwise working primarily with the whole
hand or hands) are activities required in almost all jobs. Significant limitations of reaching or
handling, therefore, may eliminate a large number of occupations a person could otherwise do.").

     Insofar as Plaintiff's argument suggests that the ALJ should have utilized a VE to address
her limitation to occasional overhead reaching with her right upper extremity, this argument is
without merit.  This is not a situation implicating a significant non-exertional impairment, such
as evidence that Plaintiff cannot perform _any_ work at or above shoulder level.  _Cf. Bruton v._
_Massanari_, 268 F.3d 824, 828 (9th Cir. 2001) (suggestion of significant non-exertional
impairment based on evidence that claimant was precluded from work at or above the shoulder
level).  Plaintiff does not argue that the limitation to occasional overhead reaching with her right
upper extremity is unsupported by the medical evidence.  Accordingly, this limitation suggests
that Plaintiff is capable of occasional overhead reaching with her right upper extremity and

18

frequent overhead reaching with her left upper extremity.  With these capabilities, there is no

indication that her limitation represents a significant non-exertional impairment requiring the use

of VE testimony.  *See, e.g., Summers v. Comm'r of Social Sec.*, 2009 WL 2051633, *23

(E.D.Cal. July 10, 2009) (limitation to no frequent forceful overhead reaching with the left upper

extremity did not represent a significant non-exertional limitation on ability to perform unskilled

light work; application of Grids not precluded); *Martin v. Barnhart*, 2006 WL 1748589, *17

(E.D.Cal. June 26, 2006) (claimant limited to occasional overhead reaching on the right; court

found no error in ALJ's use of Grids).

The ALJ's reliance on the Grids was therefore supported by substantial evidence and free

of legal error.

B.      Mental Impairment

1.      Opinion of State Agency Physician

Plaintiff contends that the ALJ failed to provide reasons for rejecting the limitations

assessed by state agency physician, Dr. Breslin.  Evidence from state agency physicians must be

treated as "expert opinion evidence."  SSR 96-6p.  An ALJ "may not ignore these opinions and

must explain the weight given to these opinions in their decisions."  *Id*.

As the Commissioner points out, the ALJ did not ignore Dr. Breslin's opinion regarding

Plaintiff's residual functional capacity.  Indeed, the ALJ acknowledged Dr. Breslin's functional

capacity assessment that Plaintiff could understand, remember and follow simple one- and two-

step instructions and usually detailed ones, attend to tasks for two hours, maintain an acceptable

work schedule, accept direct and non-confrontational correction, adapt to gradually introduced

change and should have no intensive interaction with a demanding public.  AR 16, 355.  Plaintiff

claims no error regarding this portion of Dr. Breslin's opinion.

Instead, Plaintiff contends that the ALJ failed to offer any reason for rejecting Dr.

Breslin's opinion that she had certain moderate limitations.  AR 353-54.  In reviewing the record,

there is no indication that Dr. Breslin's narrative detailing Plaintiff's functional capacity

assessment, which was set forth in the same document, did not encompass the various moderate

limitations.  There also is no indication that the moderate mental residual functional capacity

19

limitations preclude the performance of unskilled work.  *See, e.g., Thomas v. Barnhart*, 278 F.3d 947, 953-55 (9th Cir. 2002) (affirming ALJ's finding that a claimant who had "moderate mental residual functional capacity limitations" could perform unskilled jobs identified by VE).

Plaintiff specifically argues that the ALJ's failure to include Dr. Breslin's limitation in the RFC related to the ability to accept criticism from supervisors is error.  The Court disagrees. First, Dr. Breslin opined that Plaintiff could accept direct and non-confrontational correction from supervisors, not that she was incapable of accepting criticism.  Second, Dr. Breslin's opinion that she could accept criticism is consistent with the ALJ's determination that Plaintiff was capable of performing unskilled work.  SSR 85-15 ("unskilled work include[s] the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.").  Third, any moderate limitation in this area does not quantify Plaintiff's remaining ability to accept criticism as part of an RFC finding.  SSR 96-8p ("Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis."); *Cf. Propps v. Astrue*, 2010 WL 1797251, *6 (E.D.Cal. May 3, 2010) (moderate limitations did not reflect abilities as possible RFC scenario).

Further, the ALJ considered Dr. Breslin's determination that Plaintiff had mild difficulties in activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence or pace at steps two and three of the sequential evaluation.  AR 13, 349.  These moderate difficulties were not part of the RFC finding.  A moderate limitation at steps two and three does not necessarily translate into a disabling RFC. The Ninth Circuit has explained that the "step two and step five determinations require different levels of severity of limitations such that the satisfaction of the requirements at step two does not automatically lead to the conclusion that the claimant has satisfied the requirements at step five." *Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007).

2.     Opinion of Consultative Examiner

Plaintiff next argues that the ALJ erred in failing to offer any reason for rejecting the limitations assessed by the psychiatric consultative examiner, Dr. Hirokawa.  AR 471-72.

Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians). As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.1987). The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir.1984). As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. *Pitzer*, 908 F.2d at 506. And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.1995).

Here, the ALJ discussed Dr. Hirokawa's opinion that Plaintiff had certain mild to moderate limitations. AR 16, AR 471-72. The ALJ gave "significant weight" to Dr. Hirokawa as an examining source and concluded that the identified limitations would not preclude substantial gainful activity. AR 16. Based on her resulting RFC, the ALJ found that Plaintiff could perform unskilled work with limited public contact.

Plaintiff argues that the ALJ was required to include Dr. Hirokawa's findings that she was mildly to moderately limited in the ability to remember locations and work-like procedures, the ability to maintain attention and concentration for extended periods, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and the ability to perform at a consistent pace. From the opinion, it appears that the ALJ determined that, while Plaintiff had mild to moderate limitations, they did not erode her ability to perform substantial gainful activity. Simply because Plaintiff has moderate limitations in certain areas does not necessarily mean that she cannot function sufficiently in these areas in terms of the RFC finding. *See, e.g., Hoopai*, 499 F.3d at 1076.

Plaintiff does not indicate how Dr. Hirokawa's limitations are inconsistent with the ALJ's determination that she retained the ability to perform unskilled work with limited public contact. SSR 85-15.  Dr. Hirokawa did not opine that Plaintiff was disabled due to mental impairments. He clearly opined that Plaintiff's symptoms were mild and that she was capable of performing simple instructions, understanding and remembering detailed instructions, performing activities within a schedule, maintaining regular attendance and sustaining an ordinary routine.  AR 471. As Dr. Hirokawa indicated that Plaintiff was capable of work involving simple tasks, the ALJ was not required to recite each and every non-significant limitation.  *See, e.g., Strother v. Comm'r of Social Sec.*, 2009 WL 3157472, *6-7 (E.D.Cal. Sept. 28, 2009) (ALJ's omission of specific moderate limitations was not inconsistent with determination that claimant retained the ability to behave appropriately in a work setting).  The ALJ clearly took into account Dr. Hirokawa's opinion and thus he was not required to set forth why he was rejecting the opinion.

C.     Evaluation of Worker's Compensation Physician

Plaintiff contends that the ALJ erred by failing to translate the limitations assessed by the Worker's Compensation psychiatrist, Dr. Larsen.  Opening Brief, p. 9.  Plaintiff essentially asserts that the ALJ must "translate" terms of art contained in worker's compensation opinions to accurately assess those opinions for a disability determination.  As Plaintiff admits, however, an ALJ's decision need not contain an explicit "translation," but should at least indicate that the ALJ recognized the differences between the worker's compensation scheme and the Social Security scheme, and took those differences into account in evaluating the medical evidence.  *Desrosiers*, 846 F.2d at 576; *Booth v. Barnhart*, 181 F.Supp.2d 1099, 1106 (C.D.Cal. 2002); *Mejia-Raigoza v. Astrue*, 2010 WL 1797245, *8 (E.D.Cal. May 3, 2010).

Here, there is no indication that the ALJ failed to recognize that a distinction exists between the worker's compensation scheme and the Social Security scheme.  In discussing Dr. Larsen's opinion, the ALJ noted that he conducted an "agreed psychiatric evaluation."  AR 12. The ALJ also acknowledged Dr. Larsen's determination in Worker's Compensation parlance that Plaintiff was "temporarily totally disabled."  AR 12.

Plaintiff contends that the ALJ erred by failing to provide any reason to reject Dr. Larsen's opinion that she was temporarily totally disabled.  Opening Brief, p. 10.  However, an ALJ need not recite the "magic words" that he rejects a physician's opinion, so long as the record reveals specific, legitimate inferences that may be drawn from the ALJ's opinion. *Magallanes v. Bowen,* 881 F.2d 747, 755 (9th Cir. 1989) (proper for the court to read the paragraph discussing the doctor's findings and opinion and draw inferences if those inferences are there to be drawn). As noted, the ALJ acknowledged Dr. Larsen's opinion that Plaintiff was temporarily totally disabled.  Based on this acknowledgment, it is legitimate to infer that the ALJ rejected this opinion because a finding of disability under the worker's compensation scheme does not bind the Commissioner.  20 C.F.R. §§404.1504, 416.904.  Indeed, an ALJ is "not bound by an expert medical opinion on the ultimate question of disability." *Tomasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); SSR 96-5p.

Plaintiff claims that the ALJ also failed to acknowledge that Dr. Larsen assessed her with moderate mental limitations.  A review of Dr. Larsen's opinion does not identify any moderate functional limitations.  Rather, Dr. Larsen indicated that Plaintiff had psychiatric symptoms in the "moderate range of severity."  AR 500, 594.  This does not necessarily establish limitations in work-related functioning.

Even if the ALJ erred in discounting the moderate symptoms, Plaintiff has failed to show with any specificity that such symptoms preclude unskilled work with limited public contact.  As a practical matter, the ALJ considered evidence that Plaintiff initially saw Dr. Allende regarding her stress claim and neck pain.  The ALJ took note of Dr. Allende's conclusion that Plaintiff basically filed her claim to hold onto her job.  AR 15, 253.  The ALJ further noted that Plaintiff was discharged from psychological treatment in February 2006, after completing the prescribed treatment and developing adequate coping skills.  AR 15, 281-85.  Additionally, the ALJ took into account that Plaintiff stopped working due to a business-related layoff rather than because of allegedly disabling impairments.  AR 15, 441-46, 468.  Although she informed Dr. Hirokawa that she had not looked for a job due to her health issues, the ALJ found no evidence of a significant

1  deterioration in Plaintiff's medical condition since that layoff.  AR 15, 468-69.  Plaintiff has not

2  argued that these findings are unsupported.

3  **CONCLUSION**

4  Based on the foregoing, the Court finds that the ALJ's decision is supported by

5  substantial evidence in the record as a whole and is based on proper legal standards.

6  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the

7  Commissioner of Social Security.  The clerk of this Court is DIRECTED to enter judgment in

8  favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff

9  Lupe Ramirez.

10

11  IT IS SO ORDERED.

12  **Dated:    September 20, 2010**                        **/s/ Dennis L. Beck**

13                                                      UNITED STATES MAGISTRATE JUDGE